Anna S. Whitcomb v. Commissioner. Edgar B. Whitcomb v. Commissioner. Eloise McCreary Potter v. Commissioner. Lewis S. McCreary v. Commissioner. Estelle M. Dustin v. Commissioner. Robert G. McCreary v. Commissioner.
Whitcomb v. Commissioner
Docket Nos. 105178, 105179, 106533, 106607, 106608, 106609.
United States Tax Court
1942 Tax Ct. Memo LEXIS 62; 1 T.C.M. (CCH) 118; T.C.M. (RIA) 42620; December 1, 1942
*62 Income - Upon repossession of leased premises, held that the building erected thereon by the lessee did not enhance the value of the premises and the building had no market value if severed from the land; and no taxable gain was realize by such repossession. Depreciation - No taxable income having been derived because of the building on the repossessed premises, held there is no cost basis on which depreciation may be allowed to the petitioners. Taxes - Deduction therefor disallowed upon failure of proof. Lee E. Joslyn, Jr., Esq., for the petitioners Anna S. Whitcomb and Edgar B. Whitcomb. Arthur E. Petersilge, Esq., 1970 Union Commerce Bldg., Cleveland, O., for the petitioners Eloise McCreary Potter, Lewis S. McCreary, Estelle M. Dustin and Robert G. McCreary. Paul A. Sebastian, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion TYSON, J.: In these consolidated proceedings the respondent has determined deficiencies in income taxes, for the calendar year 1937, in the following amounts: Docket
No.
Petitioner
Deficiency
105178
Anna S. Whitcomb
$44,798.76
105179
Edgar B. Whitcomb
42,463.05
106533
Eloise McCreary Potter
5,203.43
106607
Lewis S. McCreary
5,831.99
106608
Estelle M. Dustin
7,458.55
106609
Robert G. McCreary
7,391.61
*63 The first and principal issue herein, common to all six proceedings, involves the question of whether the respondent erred in determining that each petitioner realized taxable income, in 1937, upon the lessee's abandonment of leases on several adjoining parcels of land owned separately by petitioners and others and on which premises the lessee had erected the Capitol Theatre Building. This issue presents the questions of (1) whether the value of the respective leased parcels of land, at the time of the repossession thereof by the respective lessors, had been enhanced by the building, and (2) whether the building had any market value at that time if severed from the land. The second, third and fourth issues involved herein are raised by assignments of additional errors by each of the petitioners Eloise McCreary Potter, Lewis S. McCreary, Estelle M. Dustin and Robert G. McCreary, namely, that the respondent erred; (2) in increasing gross income for 1937 by the amount of $2460.65, resulting from the inclusion of $1397.70 in income as profit realized on the operation of the Capitol Theatre Building, and the disallowance of a claimed deduction of $1062.92 as a loss sustained on such *64 operation; (3) in failing to allow a deduction for 1937 for depreciation on the Capitol Theatre Building; and (4) in failing to allow a deduction for each petitioner's proportionate part of the taxes assessed against the Capitol Theatre Building and paid by each petitioner during 1937. Each of those four petitioners claim an overpayment in income tax for 1937 in the respective amounts for which claims for refund were filed, as set out in the stipulation herein, which also sets out the amounts and dates of payments of their respective income taxes for the year 1937. The petitioners Anna S. and Edgar B. Whitcomb, respectively, also assigned three additional errors involving the amount of rents received and claimed deductions for depreciation and business expenses for 1937, but they have been settled by stipulation and effect thereto will be given in the recomputation under Rule 50. The proceedings have been submitted upon the pleadings, oral testimony, documentary evidence and a stipulation of certain facts. The stipulated facts not set forth herein are incorporated by reference. The findings of fact and opinion as to each issue will be set forth separately. Findings of Fact Applicable *65 to All Issues Each petitioner is an individual and a citizen of the United States. The petitioners Edgar B. and Anna S. Whitcomb, husband and wife, were, during the taxable year 1937 and for many years prior thereto, residents of Grosse Point Farms, Michigan. The petitioner Eloise McCreary Potter was a resident of Columbus, Ohio at the time her return for 1937 was filed with the collector at that city and she is now a resident of New York City, New York. The petitioner Lewis S. McCreary is a resident of Belmont, Massachusetts and filed his tax return for 1937 with the collector at Boston, Massachusetts. The petitioners Estelle M. Dustin and Robert G. McCreary are residents of Cleveland, Ohio and they filed their respective income tax returns for 1937 with the collector at that city. Each petitioner herein kept his or her books of account and made his or her income tax return for 1937 on the cash basis. First Issue Findings of Fact Throughout the taxable year 1937 the petitioners Edgar B. and Anna S. Whitcomb each owned in fee an undivided one-half interest in two parcels of land on Madison Avenue, near Grand Circus Park, in Detroit, Michigan, and the other four petitioners *66 each owned in fee an undivided one-fourth interest in an abutting parcel of land on Broadway Street. These three parcels, together with three other adjoining parcels owned in fee by the Buhl Land Company, the Harper Hospital and the Children's Free Hospital, respectively, constitute the situs of the Capitol Theatre Building. The leases on those six parcels of land, together with the building erected on the premises by the lessee, were abandoned, as hereinafter stated, by the lessee to the fee owners in 1937. In March, 1920, John H. Kunsky, an operator of motion picture theatres, secured a separate lease on each of the six parcels of land, those parcels being referred to herein as Nos. 1 to 6. The lease on parcel No. 1, fronting on Broadway Street containing 5,269 square feet, the lease on parcel No. 3, fronting on Broadway Street containing 2,773 square feet, and the lease on parcel No. 5, fronting on Madison Avenue containing 2,790 square feet, were given by the then owners thereof, J. Elizabeth Buhl, the Harper Hospital and the Children's Free Hospital, respectively. The owners of those three parcels are not involved in these proceedings. The lease on parcel No. 2, fronting on *67 Broadway Street containing 7,576 square feet, was given by the then owner thereof, Lewis A. McCreary, the father of the petitioners Eloise McCreary Potter, Lewis S. McCreary, Estelle M. Dustin and Robert G. McCreary, and the latter four persons (sometimes hereinafter referred to as the McCreary heirs) inherited such parcel of land, subject to the lease thereon, in equal shares upon the death of their father on July 9, 1929. The lease on parcel No. 4, fronting on Madison Avenue containing 5,003 square feet, was given by the then owners thereof, Edgar B. and Anna S. Whitcomb. The lease on parcel No. 6, fronting on Madison Avenue containing 6,305 square feet, was given by Edgar B. and Anna S. Whitcomb, the then owners of an undivided three-fourths interest therein, and by five other persons, the then owners of an undivided one-fourth interest therein, and on December 9, 1935 the latter five persons sold all of their interest in such parcel to the Whitcombs for the sum of $5,000 cash, plus all unpaid taxes which amounted to about $3,500. Each of the six leases was for a term of 99 years, commencing on May 1, 1920, and they contained somewhat similar general provisions in view of the contemplated *68 erection of the Capitol Theatre Building on all six parcels, but, nevertheless, did vary in certain particulars. Each lease provided for specified net rentals on an upward sliding scale basis and, in addition thereto, for the lessee's payment of all taxes, assessments, insurance, etc., and, further, that upon termination of the lease the improvements should become the property of the lessor. In each lease the lessee was given the right to remove the old rooming houses then standing on the premises, the value of which is not shown. Except for the Children's Free Hospital lease, each lease specifically provided that the lessee could erect a new building on the leased premises in conjunction with adjoining premises, but such provisions of the leases varied. The Buhl lease required that the portion of the new building on the demised premises be at least four stories high and so constructed in every respect that upon the lessor's repossession it could be readily transformed as a complete separate mercantile building apart from the rest of the structure; that the Broadway frontage have windows so that at least the front 40 feet of the structure would be wholly adaptable for store and office *69 space and that all necessary footings and foundations be built in to support any subsequently erected partition walls on the lessor's premises and, further, provided that the lessor, upon repossession, would be under no obligation to adjoining property owners or lessees for the support of any steel beams, girders or roof of the structure on the adjoining premises. The Harper Hospital lease required that the foundation of the new structure should include sufficient footings to support partition walls on the lessor's premises and, further, required that the first floor of the Broadway frontage of the proposed new building, including the demised and adjoining premises and except for a theatre entrance and exit, should be adapted to and used for store purposes. The two leases, in which the Whitcombs were lessors, provided that no partition walls or line of columns need be built on the dividing lines of the premises, but required that the proposed theatre building be at least five stories tall and that the entire Madison Avenue frontage, except for theatre entrances, be constructed for ground floor stores and upper floor offices of practical depth. The McCreary lease did not require any *70 property line segregation of the proposed new theatre building, but reserved to the lessor, upon repossession, the right to tear down and remove or remodel the portion of the building standing on the demised premises without any obligation in respect to the effect thereof or the providing of support, partition walls, or access to the remainder of the building, provided the lessor gave adjoining property owners notice and an opportunity to buy at the market value of the premises. The six parcels of land so leased by John H. Kunsky in 1920 formed a solid area comprising 29,716 square feet running through the center of one of the several triangular shaped city blocks around the semi-circular edge of Grand Circus Park in the downtown business section of Detroit. Three parcels had a frontage of 152 feet on Broadway Street and abutted the three other parcels which had a frontage of 152 feet on Madison Avenue, which streets converged at Grand Circus Park. During 1921 the lessee, John H. Kunsky, erected the Capitol Theatre Building on the entire area of the six leased parcels of land and a vacated alley without regard to the dividing lines of the leased premises, except possibly for some *71 extra foundation work called for by two of the leases. The building was designed and constructed primarily to house a large theatre with an entrance and exit on both Broadway Street and Madison Avenue, and, incidentally, to provide for comparatively shallow ground floor store space and upper floor office space on the Broadway Street and Madison Avenue frontages as required by several of the leases, and also as found necessary in floating a bond issue to meet the objection of investors to strictly single-purpose buildings. The Capitol Theatre Building, when erected in 1921, cost approximately $1,000,000. It was constructed of reinforced concrete, steel, and brick. The exterior of the Broadway Street side is of glazed terra cotta, which has the appearance of white face brick or marble, and there are pillars of the same material extending between the third and sixth floors. The exterior of the Madison Avenue side is of the same design, but finished in red face brick with pillars of the same material extending between the third and sixth floors. The theatre portion of the building occupies approximately two-thirds of the ground area, extends upward full six stories to the roof and contains *72 a large stage, dressing rooms, orchestra pit, and a total of 3,350 seats on the first floor and balcony. The theatre auditorium is enclosed by supporting columns and walls which separate it from the fringes of store and office space on the Broadway Street and Madison Avenue frontages. The theatre portion of the building is a single purpose structure, i.e., for use only as a theatre and it would be highly impracticable and prohibitive in cost to attempt to remodel it or convert it to any other use. The store and office portions of the building occupy only the frontages on Broadway and Madison to a depth of about 38 or 40 feet from the building line to the walls of the theatre auditorium. On each of those frontages the ground floor contains a theatre entrance, lobby, and a separate exit passage, 4 or 5 stores, and a separate office building entrance, and the 5 upper floors contain about 100 offices together with the necessary halls, stairways, elevators, toilets, etc., making a total of about 9 stores and 100 offices in the building. The store and office space on Madison Avenue is not connected with the similar space on Broadway, except through the basement under the theatre. The entrance *73 to the offices fronting on Broadway is located on the Harper Hospital property and the entrance to the offices fronting on Madison Avenue is located on one of the Whitcomb parcels of land and these entrances afford the only access to the office space. The Broadway entrance to the theatre is located on the Buhl parcel; the Madison Avenue entrance to the theatre is located on the Whitcomb parcel; and access to the theatre can be had only through these two entrances. The heating, lighting, water and sewerage systems of the building are designed to serve the uses for which the building was constructed and without regard to the dividing lines of the six parcels of land on which the building was erected. The supporting columns and partition walls of the ground floor stores and also of the upper floor offices were constructed also without regard to the dividing lines of the six parcels of land. It would be highly impractical and very expensive to attempt to remodel as a separate unit that portion of the building standing on any one of the six parcels of land. The general location of the Capitol Theatre Building is about 100 feet south of Grand Circus Park and one block east of Woodward *74 Avenue, which bisects that park, and is also the north-south dividing line and the main artery of the City of Detroit running from the river to Pontiac. At the time the Capitol Theatre Building was erected in 1921 it was within a good business section and the colored section which ended about three blocks east of that building was not near enough to materially affect pedestrian traffic having good purchasing power. However, from that time up to 1937 the colored section has gradually been steadily moved westward to within about one block of the Capitol Theatre Building and prior to 1937 the colored pedestrian traffic near that building had increased to an extent that resulted in a material decline of white pedestrian traffic having good purchasing power. The encroachment of the colored section is one of the principal reasons why real estate values in that section east of Woodward Avenue declined during that period and so continued thereafter. Subsequent to the erection of the Capitol Theatre Building, and prior to June, 1937, the best business establishments, which had been located east of Woodward Avenue, had moved to new locations west of that street. Following the construction *75 of the Capitol Theatre Building in 1921, and prior to June, 1937, a number of large moving picture theatres were, as a result of a boom in the construction of such theatres, built in the downtown business area, but only in the section west of Woodward Avenue, and most, if not all, of them have been in continuous operation. Since 1921 no moving picture theatres have been built in the downtown section to the east of that Avenue. The building of these new theatres resulted in an excessive number of such places of amusement in the downtown area and, also during the same period, the erection of numerous low cost neighborhood theatres, charging lower entrance fees than downtown theatres, caused a decrease in the attendance at downtown theatres. In August, 1923, Kunsky, the original lessee of the six parcels of land assigned all his interest in the leases and the building erected on the premises to the Capitol Building Company, a Michigan corporation, and the building was operated by that company until November 21, 1933, when it was adjudicated a bankrupt by the United States District Court for the Eastern District of Michigan, Southern Division. The receivers, and subsequently the trustees, *76 in bankruptcy appointed by the court operated the bankrupt estate of the Capitol Building Company until the leases were abandoned on June 1, 1937, as hereinafter stated. In the early part of 1937, pursuant to and under the direction of the Referee in Bankruptcy, a notice of final meeting of creditors of the bankrupt Capitol Building Company was sent to all known creditors thereof, which notice read, in part, as follows: The trustees will offer for sale all of their right, title, and interest in and to the following described assets: - [Here follows legal description of the Capitol Theatre Building]. If no offer is received for the right, title, and interest of the trustees therein said above described assets, or any part thereof not disposed of, will be abandoned. At the sale under the notice only one nuisance bid of $100 was made and it was rejected by the court as not a bona fide bid. On May 26, 1937, and pursuant to the above-mentioned notice, the District Court approved the final account of the trustees in bankruptcy and ordered them, inter alia, to abandon and repudiate all leaseholds under which the Capitol Building Company, bankrupt, was the lessee. In compliance with *77 such order the trustees in bankruptcy abandoned and repudiated the six leases involved herein and all of the bankrupt's interests in such leases, as of June 1, 1937, on which date the respective fee owners took over and resumed possession of their respective parcels of land and the Capitol Theatre Building erected thereon. Prior to the Capitol Building Company's adjudication as a bankrupt on November 21, 1933, the last rentals received by the lessors of the premises were paid in May, 1932, and no further rental was thereafter received by them from the Capitol Building Company prior to their repossession of the premises. During the period of the bankruptcy proceedings from 1933 to June 1, 1937, the receivers, and subsequently the trustees in bankruptcy, rented office and store space in the building and whenever the theatre was unoccupied made every effort to secure a lessee to operate it. In 1935 the trustees in bankruptcy leased the theatre to a Kansas City corporation which operated it at a loss for a period of only about five weeks in April and May of 1935 and then closed it. Thereafter, the theatre remained unoccupied for a long period, except for its occasional use for one night, *78 until the trustees, in September, 1936, leased it to the United Detroit Theatres Corporation as a "subsequent run house" for a term of five years beginning October 1, 1936, at an annual rental of $25,000 for the first year and minimum annual rentals of $30,000 for the second year, $35,000 for the third year, and $40,000 for the fourth and fifth years, but in the event the theatre should be operated as a "first run house" the annual rental would be $52,000. The lessee was given the right to terminate that lease as of the end of any lease year upon 60 days' prior notice, and after ten months of operation and on payment of one year's rent, the lessee abandoned operation of the theatre. Although the theatre was dark, i.e., not operated after those ten months, the lease of September, 1936 was still in effect at the time of the fee owners' repossession of the premises on June 1, 1937, and from that date the theatre remained dark except for occasional short use, until the execution of the hereinafter-mentioned lease on September 30, 1939. The theatre has never been operated as a "first run theatre" since 1932. On June 1, 1937, all of the stores on Broadway and two of the five stores on *79 Madison were rented and about 80 percent of the office space in the building was rented at a low rate of about $1.00 per square foot. The stores could be leased on a fairly profitable basis, but the rental of the office space was not very profitable because it was like operating two separate small office buildings with attendant separate expenses and such expense of operation was out of proportion with what it would have been had the offices not been so operated. At the time of the fee owners' repossession the Capitol Theatre Building was not in first class condition because only absolutely necessary repairs had been made but it was in fair condition. On September 30, 1939, Martin S. Callahan and Donald S. Kiskadden, as agents of all the owners under their agreement hereinafter mentioned, leased the theatre to Detroit Capitol, Inc., a dummy corporation with little or no capital back of it, for a period of three years from October 1, 1939, at an annual rental of $30,000 and an additional percentage of gross receipts above $250,000. The rent for one year, or a shorter period under certain circumstances, was guaranteed by the United Detroit Theatres Corporation, parent of the lessee *80 corporation, upon breach of the lease by the lessees. The theatre has been operated under this lease at a loss to the lessee for each year. During the period of receivership and trusteeship from November, 1933 to May 31, 1937, the financial results of the operation of the Capitol Theatre Building were: Total gross income, $150,121.48; total expenses, $91,715.94; total accrued taxes, $116,924.58; and a loss for the period of $58,519.04 without any allowance for depreciation. In February, 1937, the fee owners of the six parcels of land involved herein realized that the abandonment of the leases thereon was imminent and in anticipation thereof they entered into an agreement, dated February 17, 1937, with Martin S. Callahan and Donald S. Kiskadden (former receivers and trustees in bankruptcy of the Capitol Building Company) as their agents for the management of the Capitol Theatre Building after the termination of the leases. Such agreement sets forth, inter alia, that upon termination of the leases of March, 1920, and under the terms thereof, the lessors of each parcel of land would become the owners of that portion of the Capitol Theatre Building standing on such lessor's land *81 and also the owners of undivided interests in all the personal property in that building and that, as fee owners, they desired the continued operation of the property as a unit without physical division thereof. The agreement further provided that such agents would collect the rents; pay operating expenses; accumulate any surplus income for payment of taxes; and after payment of taxes accumulate an operating fund not to exceed $2500 and then remit monthly to the owners any net receipts in the same proportions as they were entitled to receive ground rentals under the abandoned leases, namely: Percent
Monthly
of
Lessors
Rental
Total
Edgar B. & Anna S. Whit-
comb
$2,336.66
30%
The McCreary heirs
2,166.64
28%
Buhl Land Company
1,666.66
21%
Harper Hospital
1,000.00
13%
Children's Free Hospital
600.00
8% The agreement further provided that the owners, or any of them, or the agents, or either of them, could terminate the agreement upon 90 days' written notice. Upon the abandonment of the premises by the trustees in bankruptcy and the repossession thereof by the fee owners on June 1, 1937, the owners' agents, Callahan and Kiskadden, took over and since *82 then have continued the operation and management of the Capitol Theatre Building pursuant to the above-mentioned agreement. In addition to the total net loss of $58,519.04, which resulted from the operation of the premises by the trustees in bankruptcy during the period from November 21, 1933 to May 31, 1937, as above set out, there was, on June 1, 1937, a total of approximately $120,000 due and unpaid State, City and County taxes which had become a lien against the property and there was immediate danger of losing the property unless such taxes were paid forthwith. In view of all the attendant circumstances on June 1, 1937 and also of the fact that for several years the adjoining corner properties bounded by Broadway Street, John R. Street, and Madison Avenue had been operated as an auto parking lot, the owners considered wrecking the Capitol Theatre Building and in connection therewith received from the operator of the adjoining parking lot an offer to lease the six parcels of land, if the building thereon was removed, for $30,000 a year, which was a fair rental for the land and which would have produced a larger net return than was then being received from the building. However, *83 the estimated cost of wrecking the building was $30,000 in excess of salvage value, which amount, together with the back taxes, was more than the owners could raise at that time. Accordingly, although there were no prospects in June, 1937 of deriving any increased rentals from the Capitol Theatre Building, the owners gave up the idea of wrecking the building and, through their agents, continued to operate the same. During the period from June 1, 1937 to December 31, 1940, conditions with respect to rentals improved over the prior three and one-half years during the receivership, and through rentals received from leases on the theatre, stores and offices, less expenses and taxes, but before any deduction for depreciation, the operation of the Capitol Theatre Building showed profits of $6,151.73 for June 1 to December 31, 1937; $22,084.48 for 1938; $18,266.79 for 1939; and $16,049.18 for 1940. However, such return from the building was less than the reasonably anticipated net earnings which could have been realized from the lease of the bare land as a parking lot during the same period of time. At the time of the repossession of the six parcels of land here involved on June 1, 1937 *84 by the respective fee owners thereof, including the petitioners herein, the value of those respective parcels of land had not been enhanced by either the whole building as a unit then standing on all of such parcels or any portion thereof standing on any particular parcel of land; and the building had no market value if severed from the land. In their respective tax returns for the year 1937 none of the petitioners reported any amount as gain realized from the repossession of their respective parcels of land. In asserting the deficiency against Edgar B. and Anna S. Whitcomb, respectively, the respondent determined that the Capitol Theatre Building had a value of $414,167.40 on June 1, 1937, that the Whitcombs had a thirty percent interest therein, and that each of them realized a gain of fifteen percent of such value or taxable income in the amount of $62,433.90. In asserting the deficiency against each of the other four petitioners, respectively, (the McCreary heirs) the respondent determined that the Capitol Theatre Building had a value of $396,258.90 on June 1, 1937, that the four McCreary heirs had a twenty-eight percent interest therein, and that each of them realized a gain *85 of seven percent of such value or taxable income in the amount of $27,738.12. Opinion The parties are in agreement on a question of law to be applied, namely, that if, on June 1, 1937, when the fee owners gained repossession of the parcels of land involved herein, the building erected thereon by the lessee had resulted in enhancement of the value of their respective parcels of land, such enhancement constituted taxable gain. . The issue on this point then is whether the Capitol Theatre Building did enhance the value of the respective parcels of land on June 1, 1937, and presents merely a question of fact. The documentary evidence and the testimony of numerous witnesses clearly establish that the respondent's valuation of the theatre building at $414,167.40, in the case of the Whitcombs, and at $396,258.90, in the case of the McCreary heirs, was excessive and erroneous. On this point, without reiteration of all the facts set out in detail in our findings, we briefly summarize some of those facts which, with others shown by our findings and the whole record, leads to the ultimate fact *86 in those findings that the value of the respective parcels of land repossessed by the owners thereof on June 1, 1937 had not then been enhanced by either the whole theatre building as a unit standing thereon or any portion thereof standing on any particular parcel of land. The operation of the building by the trustees in bankruptcy during the period of several years up to June 1, 1937 had resulted in a total net loss of $58,519.04 and on June 1, 1937 there was a total of approximately $120,000 unpaid taxes which had become a lien against the premises. At the Trustees' sale in 1937, as ordered by the Referee in Bankruptcy, of all the Trustees' interest in the premises, including the 99 years' lease with 82 years to run, there was no bona fide offer therefor and the lessee's interest in the premises, including the building thereon, was abandoned to the lessors, the owners of the six separate parcels of land. The building did not lend itself to remodeling for any use other than that for which it was built and the owner of each parcel was privileged to demolish the portion of the building standing on his parcel without obligation to the other owners for the necessarily resultant damage *87 to their interests in the property. The Capitol Theatre Building had steadily deteriorated in value from a period beginning not long after its erection in 1921 and continuing up to and beyond June 1, 1937, which deterioration was attributable to the following factors, among others: An excessive increase in the erection and operation of theatres in the downtown district of Detroit, in which the Capitol Theatre was located; the erection and operation in outlying districts of neighborhood theatres, with the resultant effect of decreasing attendance at the downtown theatres; the removal of the best business establishments from the section east of Woodward Avenue, in which section the theatre was located, with the resultant effect of a material decline in white pedestrian traffic in that section having good purchasing power; and the continuing encroachment of the colored population to within one block of the Capitol Theatre Building from a more remote district. The net return from the building on June 1, 1937, and for several years prior thereto, was less than the net income which could have been realized by the owners had the building not existed and the land been rented for a parking *88 lot. The ultimate fact in our findings that the building had no market value on June 1, 1937 if severed from the land is established by the record that it would have cost, at that time, $30,000 in excess of salvage value to wreck and remove the building from the land. We hold that the respondent erred in including in the gross income of each of the petitioners herein any amount as taxable gain realized upon their repossession of their respective leased parcels of land on June 1, 1937. . Second and Third Issues Findings of Fact and Opinion These two issues will be treated together since, while the third issue specifically involves the question of a deduction for depreciation on the Capitol Theatre Building, it appears that the second issue also involves that same question. As to the second issue it appears that in reporting a loss of $1,062.92 on the operation of the Capitol Theatre Building from June 1, 1937 to December 31, 1937, each of the four McCreary heirs deducted from his or her proportionate share of the income from that building a certain amount as depreciation on that building. It further appears that *89 the respondent disallowed the claimed loss deduction and determined that each of those petitioners derived an income of $1,397.70 from the operation of the building during that period. The correctness of the computation of the amount of $1,397.70 income from the building has not been questioned other than as it relates to the item of depreciation. Having decided on the first issue herein that the Capitol Theatre Building did not enhance the value of the land as of June 1, 1937 and thus the petitioners derived no taxable gain from the repossession of the land with the building thereon, it follows that petitioners have no cost basis upon which any depreciation may be allowed. Accordingly, we hold that the petitioners (the McCreary heirs) are not entitled to any deduction for depreciation on the Capitol Theatre Building. Fourth Issue Findings of Fact and Opinion The fourth issue involves the question of the amount each of the four McCreary heirs is entitled to deduct on account of his or her proportionate part of the delinquent and current taxes alleged to have been paid by them during 1937 on account of the Capitol Theatre Building. On their respective tax returns for 1937 no *90 deduction was claimed on account of such taxes, but, on the other hand, no income was reported from the operation of the theatre building. The claim now made for such a deduction forms the basis of their respective claims of an overpayment for that year. It is alleged by each of those four petitioners, but denied by respondent, that he or she paid the sum of $2,762.74 during 1937 as taxes assessed against the Capitol Theatre Building. By concession of petitioner on brief this amount should be reduced to $2,607.14. The record herein discloses that during the latter half of 1937 the agents of petitioners and the other fee owners made payments of various amounts of taxes assessed against the premises and that of the amounts so paid each of the McCreary heirs paid the amount of $2,607.14. However, the respondent has computed each petitioner's proportionate share of $1,397.70 of the income from the operation of the theatre building as being partnership income and there is no proof that the above-mentioned taxes paid, or some portion thereof, were not deducted by the respondent in arriving at the partnership net income for the period June 1 to December 31, 1937. For failure of proof *91 on this issue we hold that petitioners (the four McCreary heirs) are not entitled to the claimed deduction for taxes paid. Decisions in each of these consolidated proceedings will be entered under Rule 50.